Parker G. Stinar, Esq. (pro hac vice)
Patrick C. Lannen, Esq. (pro hac vice)
**STINAR LANNEN, PLLC**
280 W. Maple Rd., Ste. 200
Birmingham, Michigan 48009
Tel: (248) 565-2690
Fax: (248) 565-2691
Email: Parker@StinarLannenLaw.com
Patrick@StinarLannenLaw.com

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
**BAILEY GLASSER, LLP**
210 W. Division St., Bldg. 2
Maryville, IL 62062
Phone: (618) 418-5180
Fax: (304) 342-1110
tmathews@baileyglasser.com

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
**FLOYD LAW**
626 East Broad Street,
Suite 300
Richmond, Virginia 23219
Phone: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

This Document Relates To:

JANE T.Q. DOE – SLBGFL - 41

Plaintiff,

v.

APPLE INC.,

MDL No. 3199
Case No. 5:26-md-03199-NW
Member Case No. ___________
Hon. Noël Wise

**COMPLAINT FOR DAMAGES**

1. Negligence (California Law)
2. Strict Products Liability—Design Defect (California Law)
3. Products Liability—Failure to Warn (California Law)
4. UCL—Unlawful Prong (California Law)
5. UCL—Unfair Prong (California Law)

Defendant.

6. Strict Liability—Design Defect (Wis. Stat. § 895.047) (in the alternative)
7. Strict Liability—Inadequate Warnings (Wis. Stat. § 895.047) (in the alternative)
8. Negligence (Wisconsin Law) (in the alternative)

**DEMAND FOR JURY TRIAL**

Plaintiff Jane T.Q. Doe - SLBGFL - 41 ("Plaintiff"), through counsel, brings this Complaint against Defendant Apple Inc. She files it directly in In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199, under the Court's direct-filing order. She alleges as follows, on personal knowledge as to herself and on information and belief as to all other matters.

## INTRODUCTION

1. Defendant Apple Inc. ("Apple") must be held accountable for its continuing failure to protect the public from being stalked with its product, the Apple AirTag® ("AirTag").

2. In 2021, Apple released the AirTag. It knew the device could—and would—be bought and used by abusive, controlling people to track, coerce, and endanger their victims.

3. Apple also knew in 2021 that adequate safeguards were not yet in place. It released the AirTag anyway. Since then, Apple has played catch-up. It has quietly added features that still fail to curb the dangers of a product that is now more than five years old.

4. Plaintiff is one of the people Apple's choices left exposed. In or around May 2024, her former romantic partner ("Stalker"), the father of her child, hid an Apple AirTag in her new vehicle in Milwaukee, Wisconsin. He placed it underneath where their child's car seat sat.

5. Plaintiff carried an Android phone. Apple never warned her. She learned of the AirTag only because her nephew's iPhone alerted when he got into her vehicle.

6. Plaintiff reported the AirTag to police and to Apple. Apple would show her only the last four digits of the phone number tied to it. Plaintiff still has the AirTag.

7. Apple's design, warning, and release decisions were made at its headquarters in Cupertino, California. Those decisions give rise to liability under California law. Under California

law, Apple's acts and omissions constitute negligence, strict products liability for design defect and failure to warn, and violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. In the alternative, and to the extent the law of Plaintiff's home state governs any issue, Apple's acts and omissions give rise to the home-state claims pleaded below. Plaintiff seeks actual, punitive, exemplary, restitutionary, injunctive, and other relief.

## PARTIES

8. Plaintiff is an adult individual. She is domiciled in, and a citizen of, the State of Florida. She resides in Venice, Florida. At the time of the events alleged here, she lived in Milwaukee, Wisconsin. She intends to remain in Florida indefinitely.

9. Defendant Apple Inc. is a corporation organized under the laws of the State of California. Its principal place of business is in Cupertino, California. Apple is therefore a citizen of California for purposes of 28 U.S.C. § 1332(c)(1). Apple is an American multinational technology company. Among its consumer electronics is the AirTag. Apple oversees all aspects of the AirTag, including its design, manufacture, marketing, technical support, and maintenance. Apple also designs, operates, and maintains the Find My network through which AirTags function, and the iOS unwanted-tracking alerts on which persons like Plaintiff depend. Apple is a manufacturer and seller of the AirTag.

## JURISDICTION, VENUE, AND DIRECT FILING

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists. Plaintiff is a citizen of Florida. Apple is a citizen of California. No defendant shares Plaintiff's citizenship.

11. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks actual damages for severe mental anguish, emotional distress, fear for her physical safety, diagnosed psychological injury, physical injury, medical expenses, relocation expenses, loss of her sense of autonomy and security in her home and vehicle, and related losses. She also seeks punitive or exemplary damages. Together, these damages exceed the jurisdictional threshold.

12. This Court has general and specific personal jurisdiction over Apple. Apple is incorporated in California and has its principal place of business in this District. Apple is at home here.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Apple resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here. On information and belief, Apple designed the AirTag, designed its anti-stalking safeguards, decided to release it, and decided how to warn the public from its Cupertino headquarters. Plaintiff chooses this District as the venue for this action for all purposes, including trial.

14. Plaintiff files this Complaint directly in this District and in MDL No. 3199, as permitted by Pretrial Order No. 1 (the "Direct Filing Order"). Under the Direct Filing Order, Plaintiff designates the Northern District of California as the proper venue for this action.

15. Venue in this District does not depend on the Direct Filing Order. Because Apple resides here and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here, Plaintiff could have filed this action in this District independent of MDL No. 3199. Plaintiff does not designate any other district as her home or transferor venue.

16. **Intradistrict Assignment.** Under Civil L.R. 3-2(c) and 3-5(b), this action relates to MDL No. 3199. It should be assigned to the Division and the Judge presiding over that proceeding.

## CHOICE OF LAW

17. California law governs Plaintiff's claims. Plaintiff pleads her California-law claims first. She pleads her Wisconsin-law claims in the alternative.

18. California law should govern because this action was filed in this District, so California's choice-of-law rules apply, and the conduct Plaintiff challenges occurred in California. On information and belief, Apple's officers and managing agents in Cupertino made the decisions to release the AirTag with safeguards Apple knew were inadequate; to keep selling it after tens of thousands of stalking reports; to deliver safety fixes through owner-dependent firmware; and to

describe stalking incidents to the public as "rare." California has a strong interest in regulating the conduct of a California corporation that designs dangerous products in California and sells them nationwide.

19. In the alternative, Wisconsin law governs Counts VI through VIII to the extent the Court determines that Wisconsin has the greater interest in any issue. Plaintiff was tracked in Wisconsin and suffered her injuries there.

20. Plaintiff does not concede that any conflict exists between Wisconsin law and California law on any issue. If a true conflict exists, Plaintiff reserves the right to brief the choice of law at the appropriate stage.

## GENERAL ALLEGATIONS

21. On April 2, 2024, ITV News in the United Kingdom aired a report on AirTag stalking.[1] In response, Apple stated: "We have identified even more ways we can update AirTag safety warnings and help guard against further unwanted tracking."

22. This promise of future, unspecified action came too late for Plaintiff. Within weeks after Apple made it, Apple's product was used to track her. The time for adequate safety warnings and better protections was April 2021, before the AirTag's release. It is unconscionable for Apple to keep on the market a product it knows is still unsafe.

23. Apple has always known that any safeguards it built into AirTags would only, in Apple's own words, "deter as opposed to prevent malicious use."

24. Each year, an estimated 13.5 million people are stalked in the United States. Nearly one in three women and one in six men experience stalking at some point in their lives.[2]

---

[1] ITV News, *AirTags Becoming "Weapon of Choice of Stalkers" as GPS Tracker Cases Rocket by 317%*, YouTube (Apr. 2, 2024), https://www.youtube.com/watch?v=TBhYdgt1FhE.

[2] Stalking Prevention, Awareness, and Resource Ctr. (SPARC), *Stalking Fact Sheet* 1 (2019), https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf.

25. Apple's AirTags have become a critical—and shameful—part of this problem. From 2021 forward, Apple has received over 40,000 stalking reports, at times averaging 1,000 complaints per month.

26. Stalking takes many forms. Most often it involves unwanted, repeated behavior that would cause fear in a reasonable person. Whatever the method, the common thread is the fear it creates in the victim.

27. That fear erodes a victim's autonomy and disrupts daily life. One in eight employed stalking victims misses work because of the victimization. More than half of those lose more than five days of work. One in seven stalking victims moves as a result.[3]

28. Stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than the general population. Most report a fear of not knowing what will happen next. Stalking is a significant risk factor for homicide in abusive relationships.

29. No one disputes any of this. Stalking is a serious, well-documented phenomenon. It ruins lives, and it ends them.

30. Knowing all this, Apple released a small, concealable device. It allows anyone with an iPhone to continuously and precisely track another person's location for $29.00.

31. Before releasing the AirTag in April 2021, Apple knew it would be used as a stalking tool. Apple even designed certain features to reduce that risk. But Apple released the product knowing those features could not prevent stalking.

32. At release, Apple knew the AirTag's anti-stalking measures were inadequate for at least these reasons:

a. The iPhone notification system alerted users to an unknown AirTag only after three days—an eternity in a stalking situation;

b. Android users received no notifications at all, leaving roughly half of the smartphone-using population unprotected;

---

[3] Katrina Baum et al., U.S. Dep't of Just., Bureau of Just. Stat., *Stalking Victimization in the United States* 1 (Jan. 2009), https://www.justice.gov/archive/ovw/docs/bjs-stalking-rpt.pdf.

c. The AirTag's speaker, meant to alert a victim to an unknown AirTag, was quiet, easily muffled, and easily defeated, and instructions for disabling it were widely available online; and

d. The AirTag's small, light, and concealable form made it trivially easy to hide in a victim's belongings or vehicle.

33. Apple made a calculated business decision to release the AirTag anyway. It put market timing and profits ahead of human safety.

34. The consequences were swift and predictable. Soon after the April 2021 release, reports poured in from people who had been stalked, tracked, and terrorized with AirTags.

35. Stalkers have used AirTags to track victims to their homes, workplaces, and places of refuge. AirTags have been hidden in wheel wells, under bumpers, in purses, in jacket pockets, and in children's backpacks.

36. AirTags have enabled abusers in domestic situations to monitor and control the people closest to them. Many victims had no idea they were being tracked until it was too late.

37. The consequences have been as severe as possible. Multiple murders have occurred in which the killer used an AirTag to track the victim.

38. With its "stalker-proof" protections exposed as inadequate, Apple has spent five years scrambling. Most of these failures persist. Apple keeps reacting to harm its product has caused instead of preventing it. As one commentator put it: "You wouldn't allow a car to come to mass-market without having vigorous testing, so why are we allowing smart tech to just be released and then fixing safety features later?"[4]

[4] Ellie Fry, *Inside Chilling Rise of AirTag Stalking as Apple Device Is Branded 'Gift to Abusers'*, The Mirror (Apr. 24, 2023), https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435.

## FACTUAL ALLEGATIONS

### A. How the AirTag Works

39. Apple introduced the AirTag in April 2021 as a standalone product.[5] It is about the size of a U.S. quarter. It is a tracking beacon marketed to help consumers find objects such as keys or purses.

40. The AirTag uses Bluetooth Low Energy ("BLE") technology. It broadcasts a rotating identifier. Nearby Apple devices detect that signal and relay the AirTag's location to Apple's servers through the "Find My" network.

41. The Find My network turns the world's Apple devices into a mesh tracking network. Any powered-on, connected iPhone, iPad, or Mac can relay an AirTag's location. There are over two billion active Apple devices. The network works silently, without the knowledge or consent of the device owners who relay the data.

42. As a result, an AirTag's location can be updated virtually anywhere—including on the streets, parking lots, and driveways of Milwaukee, Wisconsin.

### B. Apple Knew the AirTag Would Be Used to Stalk

43. Before the AirTag's release, commentators, journalists, and domestic violence advocates publicly warned that small, cheap Bluetooth trackers would be used as stalking tools.

44. Apple was well aware of these concerns. Apple anticipated that the AirTag would be used for unwanted tracking.

45. Apple described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" malicious use. That was an admission that Apple knowingly released the product with inadequate safeguards.

46. Apple launched the AirTag with only minimal safeguards. These were (a) an audible alert that sounded after three days away from the owner's iPhone, and (b) a notification that alerted iPhone users—but not Android users—to an unknown AirTag traveling with them.

---

[5] Press Release, Apple Inc., *Apple Introduces AirTag* (Apr. 20, 2021), https://www.apple.com/newsroom/2021/04/apple-introduces-airtag/.

47. These measures were woefully inadequate. Three days without an alert gives a stalker ample time to learn a victim's home, workplace, and routine.

48. About half of U.S. smartphone users use Android devices. At launch, they had no way to detect an AirTag tracking them. Apple released a "Tracker Detect" app for Android in December 2021, eight months after launch. The app required users to start a scan manually.

49. As of May 2024, when Plaintiff was tracked, Android users still had no automatic, built-in alert for an unknown AirTag traveling with them. The only Apple-provided tool for Android users was the manual-scan Tracker Detect app. That app works only if a person already suspects she is being tracked, downloads the app, and starts a scan herself.

50. In February 2022, Apple announced it would cut the time before an unknown AirTag sounds from three days to a random interval between 8 and 24 hours. Even that interval gives a stalker ample time to locate a victim's home, workplace, and routine.

51. Apple's piecemeal approach—half-measures adopted only after public outcry—shows that Apple has consistently put sales ahead of safety.

**C. The AirTag's Safeguards Fail Even iPhone Users**

52. Apple's protections fail even the iPhone users they were built for. They fail Android users like Plaintiff even more.

53. The iOS "Item Safety Alerts" feature relies on algorithms that often fail to detect tracking in time. An unknown AirTag must travel with the victim for some period before any alert issues. During that window, the stalker can watch the victim's every move.

54. The alerts are easy to miss. They look like ordinary push notifications. They can be buried, swiped away, or simply overlooked. Users who turn off Location Services for privacy reasons also lose these alerts. Apple does not explain this.

55. An alert, standing alone, does not tell the victim where the AirTag is. To find it, the victim must rely on the AirTag's sound. That sound is deficient in at least four ways:

a. It is too quiet. The alert reaches about 60 decibels at most. A purse, fabric, or a car's exterior can muffle it;

b. It is not distinct. The chime sounds like countless other device alerts;

c. It is not continuous. It stops before the person can find the device; and

d. It is easily disabled. The AirTag keeps working after the speaker is removed, and online tutorials explain how.

56. Even when a victim finds an AirTag, her options are limited. She must take physical possession of it and remove its battery. Finding it may be impossible or costly. Dismantling it can compromise evidence. And the stalker can simply deploy another AirTag.

57. Safety updates to AirTag firmware are not pushed automatically to the victim. They depend on the AirTag's owner—the stalker—to install them.

**D. Feasible Safer Alternative Designs Existed**

58. At all relevant times, safer alternative designs existed. Each would have prevented or significantly reduced the risk of AirTag stalking without substantially impairing the product's utility for finding lost items. Each was economically and technologically feasible when the AirTag left Apple's control, using existing or reasonably achievable scientific knowledge. Among other things, Apple could have:

a. alerted a tracked person within minutes, not hours or days;

b. designed a louder, distinct, continuous, non-removable, and tamper-resistant speaker, and rendered the AirTag non-functional if the speaker were disabled;

c. enabled precise, on-demand location of an unknown AirTag by the person it is traveling with, so the victim could find a concealed device without police help;

d. required identity verification or account linking before activation, creating accountability and deterring anonymous stalking;

e. automatically disabled tracking when an AirTag stays near a non-owner's device for a defined period;

f. required periodic owner re-authentication to prevent indefinite passive tracking;

g. released simultaneous, equivalent, automatic detection for Android users at launch; and

h. made the AirTag larger and more conspicuous, so it could not be easily hidden under a vehicle's bumper.

59. Apple chose not to adopt any of these designs.

**E. Apple Consciously Disregarded the Danger**

60. Only weeks after the AirTag's release, Apple CEO Tim Cook was briefed on press reports describing the AirTag as "a new means of inexpensive, effective stalking." Cook was told that Apple could weather the storm: "At this time, we are not seeing this narrative gain steam in media or on social…." Apple chose to manage the narrative instead of the danger.

61. Apple's officers, directors, and managing agents, including Mr. Cook, authorized, directed, or ratified the decision to release and keep selling the AirTag without adequate safeguards. They did so with knowledge of the ongoing harm.

62. Apple publicly called AirTag stalking "rare." Its internal data showed more than 40,000 unwanted-tracking reports in the three years after release, ending in April 2024. Apple also knew that most law-enforcement requests it received about AirTags concerned stalking.

63. Apple has also failed to support victims. Its legal-process guidelines state that AirTag pairing history is available for only up to 25 days. Victims who seek protection or prosecution are often left without the evidence they need.

64. The AirTag sells for about $29. Apple has sold tens of millions. Before the AirTag, effective GPS trackers were expensive, needed monthly subscriptions, and were hard to hide. The AirTag removed those barriers.

65. The harm is ongoing. Apple continues to sell AirTags with safeguards that remain inadequate.

**PLAINTIFF'S EXPERIENCE WITH AIRTAGS**

66. At the time of the events described below, Plaintiff lived in Milwaukee, Wisconsin. The tracking described below occurred in and around Milwaukee, Wisconsin.

67. Plaintiff had previously been in a romantic relationship with a man who is referred to here as the "Stalker." He is the father of Plaintiff's son.

68. For years, Stalker kept tabs on Plaintiff and their son. Stalker later obtained visitation with their son.

69. In or around May 2024, after a visit at a baseball park, Stalker put their son into Plaintiff's new vehicle. No other adult had been in that vehicle.

70. A few days later, Plaintiff found an Apple AirTag hidden underneath where her son's car seat sat.

71. During the days the AirTag traveled with Plaintiff, it reported her vehicle's location to Stalker through the Find My network. Stalker could see where she lived, worked, shopped, and parked, and where she took their son.

72. Plaintiff did not consent. She did not know the AirTag was there.

73. Plaintiff used an Android phone. She did not have Tracker Detect or a similar app. Apple never sent her an unwanted-tracking alert.

74. Plaintiff learned of the AirTag only by chance. Her nephew, who carried an iPhone, received an alert when he got into her vehicle. That alert went to a passenger, not to Plaintiff. It came only after the AirTag had already traveled with Plaintiff for days. Apple's safeguards did not work for Plaintiff. She found the device despite them, not because of them.

75. In June 2024, Plaintiff reported the tracking to the Milwaukee police. Police told her they needed the full phone number tied to the AirTag to obtain a warrant. Police took no further action.

76. In June 2024, Plaintiff also reported the AirTag to Apple at an Apple store. Apple showed her only the last four digits of the phone number tied to the AirTag. Apple told her that a warrant was needed to obtain the full number.

77. Plaintiff tried to obtain a restraining order against Stalker. There was not enough evidence to obtain one.

78. Plaintiff kept the AirTag. It remains in her possession.

79. Plaintiff would have discovered the AirTag far sooner, or Stalker would have been deterred from using it, if Apple had adopted the safer alternative designs and warnings described above. Each specific defect contributed to her harm, as alleged in Count I.

80. As a direct and proximate result, Plaintiff suffered fear, emotional distress, and a loss of security. She was diagnosed with complex post-traumatic stress disorder. She also developed physical injury: an autoimmune condition that stress triggers. Her treating providers have linked the onset or flare of that condition to the stress of being tracked. She has had to relocate.

81. Plaintiff has also suffered economic losses because of Apple's conduct, including medical expenses and relocation expenses, in an amount to be proven at trial. Plaintiff decided to relocate only after she discovered the AirTag and learned that she could not identify or stop the person tracking her.

**STATUTE OF LIMITATIONS AND TOLLING**

82. Under Wisconsin law, an action to recover damages for injuries to the person must be commenced within three years. Wis. Stat. § 893.54(1m)(a). Plaintiff learned she was being tracked in or around May 2024, while the Hughes Action was already pending. Her claims are timely under Wisconsin law. Her claims are also timely under the applicable California limitations period as tolled by the Hughes Action and American Pipe.

83. On December 5, 2022, a putative class action was filed against Apple in the U.S. District Court for the Northern District of California. It is captioned *Hughes v. Apple, Inc.*, No. 3:22-cv-07668-VC (the "*Hughes* Action"). The Hughes Action asserted claims on behalf of a proposed nationwide class of people who were tracked, stalked, or otherwise harmed through AirTags. It arose from the same course of conduct alleged here: Apple's release and continued sale of the AirTag without adequate safeguards against unwanted tracking.

84. Plaintiff was tracked without her knowledge or consent by a concealed AirTag while the Hughes Action was pending. She is, and at all relevant times was, a member of the putative class asserted in the Hughes Action. She did not opt out. She was not a named plaintiff. She relied on the named plaintiffs to press the class's claims.

85. On March 9, 2026, the Honorable Vince Chhabria entered an order denying class certification in the Hughes Action. (Hughes Action, ECF No. 287.)

86. Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Once tolled, the limitations period "remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).

87. Plaintiff's claims accrued no earlier than the date she learned she was being tracked. The Hughes Action was already pending on that date. The limitations period therefore never began to run before class certification was denied on March 9, 2026. Plaintiff filed this action well within the applicable limitations periods as tolled.

88. In the alternative, any limitations period was tolled under applicable equitable-tolling principles and the discovery rule. Plaintiff did not know, and could not reasonably have known, that she was being tracked before she found the AirTag in or around May 2024. The AirTag was concealed under her son's car seat. Her Android phone gave no alert. She did not learn that the AirTag's safeguards had failed her, or that Apple's design choices caused that failure.

**COUNT I**

**NEGLIGENCE**

**(California Law)**

89. Plaintiff repeats and realleges all preceding paragraphs.

90. Under California negligence principles, Apple owed Plaintiff a duty of reasonable care in the design, testing, marketing, distribution, and post-sale support of the AirTag.

91. Each relevant consideration supports that duty. Harm to people like Plaintiff was highly foreseeable. The certainty that such people would be injured was great. The connection between Apple's conduct and Plaintiff's injuries was close. Moral blame attaches to Apple's

knowing release of an inadequately safeguarded product. And public policy favors preventing the harm.

92. As the manufacturer that designed the AirTag and placed it into the stream of commerce, Apple had a duty to avoid exposing foreseeable users and bystanders—including persons foreseeably tracked by the device—to unreasonable risks of harm. That duty included designing the AirTag so it would not create an unreasonable risk of use as an instrument of criminal stalking. Apple specifically anticipated and acknowledged that risk before launch.

93. Apple breached its duty. Among other things, Apple released the AirTag knowing its safeguards would only "deter as opposed to prevent" stalking; designed alerts that issue only after a tracking device has traveled with the victim for hours or days; designed a speaker too quiet, too brief, and too easily muffled to lead a victim to a concealed device; failed to adopt the feasible safer alternative designs alleged above; failed to adequately test the AirTag's anti-stalking features in real-world concealment scenarios, such as placement under a vehicle's bumper; and continued to sell the AirTag after learning of tens of thousands of stalking reports, while publicly minimizing the problem. It rushed AirTags to market and kept selling them without timely, reliable detection of unwanted tracking for Android users like Plaintiff or for iPhone users. It also gave tracked persons no reliable way to locate a hidden AirTag.

94. Apple's breach was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm that Apple anticipated, was warned about, and designed its safeguards—inadequately—to prevent. The AirTag's inadequate safeguards substantially enhanced the Stalker's ability to track Plaintiff covertly, including while it was hidden underneath her son's car seat.

95. Each of the following defects was a substantial factor in Plaintiff's injuries:

a. **Alert sent only to a bystander.** Had Apple alerted the person the AirTag was traveling with, rather than only an iPhone user who happened to ride in the vehicle, Plaintiff would have learned of the tracking at once, not by chance.

b. **Inadequate speaker.** Had the AirTag sounded a loud, distinct, continuous alert, Plaintiff would have heard it from under the car seat during her first drives and found the device within hours.

c. **No on-demand location or identification.** Had Plaintiff been able to locate the AirTag on demand and identify its owner, she would have had evidence to give police and to support her restraining-order petition. Instead, police and Apple told her they needed the full phone number, which Apple would not provide.

d. **No account accountability.** Had activation required verified identity, Stalker would have known the AirTag was traceable to him and would have been deterred from using it.

e. **No automatic Android alert.** Had Plaintiff's Android phone alerted her automatically within minutes, she would have searched her vehicle and found the AirTag the same day it was placed, days earlier than she did.

96. As a direct and proximate result of Apple's negligence, Plaintiff suffered the injuries described above and is entitled to compensatory damages.

97. Apple acted with malice, oppression, or fraud within the meaning of Cal. Civ. Code § 3294. Its officers, directors, and managing agents knew of the probable dangerous consequences of the AirTag's design and consciously chose not to avoid them. Plaintiff is entitled to punitive damages under California law.

**COUNT II**

**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

**(California Law)**

98. Plaintiff repeats and realleges all preceding paragraphs.

99. Apple designs, manufactures, distributes, and sells AirTags. Apple placed the AirTag used to track Plaintiff into the stream of commerce.

100. The AirTag is defective in design under the consumer-expectations test. It failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable way. Consumers may know that tracking devices can be used. But an ordinary

consumer would reasonably expect that Apple had built effective safeguards to detect and prevent unauthorized tracking, particularly given Apple's promotion of the AirTag's anti-stalking features. An ordinary consumer would expect Apple to warn her promptly, whatever phone she carried, when an unknown AirTag was hidden on her vehicle, and to help her find it. The AirTag failed those expectations.

101. The AirTag is also defective in design under the risk-benefit test. Its foreseeable risk of facilitating stalking outweighs the benefits of its design. Practical, technically feasible alternative designs existed that would have prevented or significantly reduced Plaintiff's injuries. They include immediate, reliable, and tamper-resistant alerts; alerts that disclose every unknown AirTag traveling with the tracked person; precise on-demand location by the tracked person; and design features that reduce covert placement and continued tracking.

102. The design defect was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm the AirTag's anti-stalking safeguards were designed—and failed—to prevent. Apple's admission that its safeguards would only "deter as opposed to prevent" malicious use confirms that Apple anticipated and accepted the risk of exactly this conduct.

103. As a direct and proximate result of the AirTag's defective design, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known safety risks constitutes malice, oppression, or fraud under Cal. Civ. Code § 3294. Plaintiff is entitled to punitive damages under California law.

**COUNT III**

**PRODUCTS LIABILITY: FAILURE TO WARN**

**(California Law)**

104. Plaintiff repeats and realleges all preceding paragraphs.

105. Apple designed, manufactured, distributed, and sold the AirTag used to track Plaintiff.

106. When the AirTag left Apple's possession, it posed known or knowable risks. Those risks included covert tracking of non-consenting persons and the failure of Apple's alerts to notify tracked persons like Plaintiff in time, including Android users, or to help them locate the device. Apple knew of these risks, or could have known of them in light of the information available to it at the time of manufacture and distribution. That information included its own pre-launch assessment that its safeguards would only "deter as opposed to prevent" malicious use.

107. These risks presented a substantial danger when the AirTag was used in an intended or reasonably foreseeable way. Ordinary consumers, and people like Plaintiff who could be tracked by an AirTag, would not have recognized them.

108. Apple failed to adequately warn of these risks or to instruct the public on how to detect and guard against unwanted tracking. Apple controls public-facing channels that reach non-owners, including its website, its safety guidance, its Android app listing, and its materials for law enforcement and domestic-violence advocates. Through those channels, Apple failed to warn that Android users would receive no automatic alert; failed to instruct the public that people who carry Android phones must manually scan for trackers, and when; failed to instruct tracked persons how to locate an AirTag hidden on or under a vehicle; and failed to disclose that disabling Location Services would also disable unknown-AirTag alerts. Apple also failed to provide timely alerts to people being tracked, and failed to act as a reasonable manufacturer would have acted, after sale, once it learned of tens of thousands of stalking reports.

109. Apple's failure to warn was a substantial factor in causing Plaintiff's injuries. As a mother sharing custody with a man who had kept tabs on her for years, Plaintiff paid attention to her safety. Had Apple widely warned that Android users must scan manually for hidden trackers, Plaintiff would have learned of that warning and followed it, including after Stalker had access to her vehicle. She would have found the AirTag as soon as it began traveling with her.

110. As a direct and proximate result of Apple's failure to warn, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known risk also entitles Plaintiff to punitive damages under Cal. Civ. Code § 3294.

**COUNT IV**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNLAWFUL PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

111. Plaintiff repeats and realleges all preceding paragraphs.

112. The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

113. Apple engaged in business acts and practices in California. On information and belief, Apple designed the AirTag and its safeguards, decided to release and keep selling it, and decided how to warn the public at its Cupertino headquarters.

114. Apple's conduct is unlawful. As alleged above, it constitutes negligence and products liability under California law. Each of those independent violations serves as a predicate for the UCL's unlawful prong.

115. Apple's conduct also violates the policy and purpose of the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq. Apple designed, released, and kept selling the AirTag without adequate safeguards against unconsented location tracking. It failed to give Plaintiff, an Android user, a timely and reliable way to detect and locate the AirTag tracking her. In doing so, Apple aided, and was a substantial factor in enabling, the electronic tracking of Plaintiff's location and movements by a third party without her consent.

116. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

117. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unlawful business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law.

**COUNT V**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNFAIR PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

118. Plaintiff repeats and realleges all preceding paragraphs.

119. Apple's business practices are unfair. Releasing and continuing to sell AirTags with safeguards Apple knew were inadequate is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of the harm far outweighs any utility of Apple's conduct.

120. Apple's business practices are also unfair because they undermine public policy tethered to specific constitutional and statutory provisions. Those provisions include the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., and the right to privacy in the California Constitution, Cal. Const. art. I, § 1.

121. Apple's business practices are further unfair because (1) the injury to consumers is substantial; (2) the injury is not outweighed by any countervailing benefit to consumers or competition; and (3) consumers could not reasonably have avoided it. Plaintiff could not avoid a danger hidden on her vehicle that her phone did not timely disclose or help her locate.

122. Reasonably available alternatives existed to further Apple's legitimate business interests. Apple's practices are a continuing course of unfair competition because Apple continues to sell AirTags.

123. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

124. Under Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Apple from engaging in the unfair business practices alleged here in connection with the sale of AirTags, and restitution to the extent permitted by law.

**COUNT VI**

**STRICT LIABILITY: DESIGN DEFECT**

**(Wisconsin Law, Wis. Stat. § 895.047; Pleaded in the Alternative)**

125. Plaintiff repeats and realleges all preceding paragraphs.

126. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Wisconsin law governs.

127. In an action for damages caused by a manufactured product based on a claim of strict liability, a manufacturer is liable if the product is defective, the defective condition rendered it unreasonably dangerous, the defect existed when the product left the manufacturer's control, the product reached the user without substantial change, and the defect was a cause of the claimant's damages. Wis. Stat. § 895.047(1).

128. A product is defective in design if the foreseeable risks of harm it poses could have been reduced or avoided by a reasonable alternative design and the omission of that design renders the product not reasonably safe. Id. § 895.047(1)(a).

129. Apple manufactured the AirTag used to track Plaintiff. The defect is not the AirTag's ability to track objects. The defect is the inadequate design of its anti-stalking safeguards. An ordinary person would not recognize that an AirTag hidden in her vehicle would give her Android phone no alert. The foreseeable risk of covert, nonconsensual tracking could have been reduced or avoided by the reasonable alternative designs alleged in paragraph 58, including automatic detection for Android users at launch. Each was feasible when the AirTag was sold, as Apple's later safety changes confirm. Omitting those designs rendered the AirTag not reasonably safe and unreasonably dangerous to persons like Plaintiff. AirTags have been used to track victims who were later murdered.

130. The defective condition existed when the AirTag left Apple's control. The AirTag reached Stalker without substantial change in its condition.

131. The design defect was a cause of Plaintiff's damages, for the reasons alleged in Count I. Stalker's use was foreseeable. It was the precise risk Apple anticipated. Plaintiff did not misuse, alter, or modify the AirTag.

132. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above, including diagnosed complex post-traumatic stress disorder and the physical injury of a stress-triggered autoimmune condition. Apple acted in intentional disregard of Plaintiff's rights, and Plaintiff is entitled to punitive damages under applicable Wisconsin law.

**COUNT VII**

**STRICT LIABILITY: INADEQUATE INSTRUCTIONS OR WARNINGS**

**(Wisconsin Law, Wis. Stat. § 895.047; Pleaded in the Alternative)**

133. Plaintiff repeats and realleges all preceding paragraphs.

134. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Wisconsin law governs.

135. A product is defective because of inadequate instructions or warnings if the foreseeable risks of harm it poses could have been reduced or avoided by reasonable instructions or warnings and the omission of those instructions or warnings renders the product not reasonably safe. Wis. Stat. § 895.047(1)(a).

136. Apple knew that AirTags would be used to covertly track people. Apple failed to give tracked persons, including Android users like Plaintiff, timely and understandable warnings through the public-facing channels. Apple failed to warn that Android users would receive no automatic alert and must scan manually. Apple also failed to give clear instructions on how to find and disable a hidden AirTag, including one hidden on or under a vehicle.

137. Reasonable warnings and instructions would have reduced or avoided the risk of harm to Plaintiff. Their omission rendered the AirTag not reasonably safe and unreasonably dangerous.

138. The inadequate warnings and instructions were a cause of Plaintiff's damages. Had Apple given them, Plaintiff would have learned of them and followed them, as alleged in Count III, and would have found the AirTag as soon as it began traveling with her.

139. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above, including diagnosed complex post-traumatic stress disorder and the physical injury of a stress-triggered autoimmune condition. Plaintiff is entitled to punitive damages under applicable Wisconsin law.

**COUNT VIII**

**NEGLIGENCE**

**(Wisconsin Law; Pleaded in the Alternative)**

140. Plaintiff repeats and realleges all preceding paragraphs.

141. She pleads this Count in the alternative to Counts I through V, as Federal Rule of Civil Procedure 8(d)(2) and (3) permit, to the extent the Court determines that Wisconsin law governs.

142. Wisconsin's strict product liability statute does not apply to actions based on a claim of negligence. Wis. Stat. § 895.047(6). Plaintiff therefore pleads her negligence claim separately under Wisconsin law.

143. Apple owed a duty to exercise reasonable care in designing, testing, marketing, warning about, and supporting the AirTag. That duty ran to persons Apple foresaw would be tracked with AirTags, including Plaintiff. Apple knew before launch that the AirTag would be used to stalk. Apple's conduct created and increased that risk. It released a cheap, concealable tracker that works on a network of more than two billion devices, while leaving Android users with no automatic protection.

144. Apple breached that duty by releasing and continuing to sell the AirTag with inadequate safeguards against foreseeable stalking; failing to provide automatic detection for Android users; failing to adopt feasible safer alternative designs; and failing to warn tracked persons adequately.

145. Apple's breaches caused Plaintiff's injuries, for the defect-specific reasons alleged in Count I. Stalker's misuse was foreseeable. It was the very harm Apple's safeguards were meant to address. Stalker's criminal conduct does not relieve Apple of liability, because Apple anticipated that conduct and designed safeguards, inadequately, to address it. The harm here is neither remote nor out of proportion to Apple's culpability.

146. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above, including diagnosed complex post-traumatic stress disorder and the physical injury of a

stress-triggered autoimmune condition. Plaintiff is entitled to punitive damages under applicable Wisconsin law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Apple and award the following relief:

a. Judgment in Plaintiff's favor on the causes of action in this Complaint, including, in the alternative, the Wisconsin-law causes of action;

b. Actual damages, including for past and future mental anguish and emotional distress, physical injury, medical expenses and the cost of related treatment, and relocation expenses, in an amount to be proven at trial and exceeding $75,000;

c. Punitive damages under Cal. Civ. Code § 3294 and, in the alternative, punitive damages under applicable Wisconsin law, in an amount to be proved at trial;

d. Restitution under Cal. Bus. & Prof. Code § 17203 to the extent permitted by law;

e. Reasonable attorney's fees to the extent permitted by applicable law;

f. Pre-judgment and post-judgment interest as permitted by law;

g. Costs of suit; and

h. Such other relief as the Court deems just and proper.

Dated: November 4, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ ______________
Parker G. Stinar, Esq. (pro hac vice)
Patrick C. Lannen, Esq. (pro hac vice)

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW

Counsel for Plaintiff

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b) and Civil L.R. 3-6, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 4, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ ____________________
Parker G. Stinar, Esq. (pro hac vice)
Patrick C. Lannen, Esq. (pro hac vice)

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW

Counsel for Plaintiff